### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE RAINEY, Derivatively on Behalf of VROOM, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| PAUL J. HENNESSY, DAVID K. JONES, PATRICIA MORAN, MARK E. ROSZKOWSKI, ROBERT J. MYLOD, JR., SCOTT A. DAHNKE, MICHAEL FARELLO, LAURA W. LANG, and LAURA G. O'SHAUGHNESSY, | ) Case No. 1:21-cv-6933 ) ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT** ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| VROOM, INC., | ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiff Julie Rainey ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for insider trading, violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

### NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal

Defendant Vroom, Inc. ("Vroom" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Vroom's reputation, goodwill, and standing in the business community and has exposed Vroom to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Vroom in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Vroom's directors and officers from June 9, 2020 through the present (the "Relevant Period").

3.      Vroom is a New York City based used car retailer and e-commerce company that allows customers to buy and sell used cars online. After a vehicle is purchased, the Company provides contact free delivery.

4.      Vroom became a public company through an initial public offering on June 9, 2020 (the "IPO"). Prior to the IPO, Vroom significantly reduced its inventory to account for an expected drop in demand caused by the COVID-19 pandemic.

5.      On August 12, 2020, the Company announced its financial results for the second quarter of 2020, which revealed that Vroom had earned only $253.1 million in revenues for the quarter, a 3% year-over-year decline, largely from a 17% decline in the average vehicle selling price per ecommerce unit. Additionally, Vroom only expected to achieve an average total revenue per ecommerce unit of $23,500 for the third quarter, which represented a 25% year-over-year average product price decline. As a result of this lower average price, Vroom stated it achieved only $314 in average gross profit per ecommerce vehicle in the second quarter of 2020, a 75% year-over-year profit decline, and projected average gross profit per unit of only $1,600 to $1,700

2

for the third quarter of 2020.

6.      On this news, the Company's stock price fell to $56.37 on August 13, 2020, an 18.3% decrease from the previous trading day's closing price of $69.01.

7.      On November 11, 2020, Vroom announced its third quarter 2020 financial results, which disclosed that Vroom expected to suffer sharply higher losses in the fourth quarter of 2020, with adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") losses projected to increase from $36 million in the third quarter of 2020 to at least $44 million and as high as $52 million. The midpoint being $48 million was a 33% sequential increase.

8.      On this news, the Company's stock price decreased to $35.49 on November 12, 2020, a 13% decrease from the previous trading day's closing price of $40.80. Although some of the Company's deficiencies were disclosed by this time, the stock continued to trade at artificially inflated prices because the Individual Defendants continued to make material misstatements regarding adverse events and uncertainties that were negatively impacting Vroom's business.

9.      Moreover, before the entirety of the adverse information regarding Vroom's business prospects had been disclosed to the market, certain Individual Defendants, as described below, dumped shares of their Vroom stock, reaping approximately $10.3 million in total proceeds from insider sales based on material non-public information.

10.     The truth fully emerged on March 3, 2021 when Vroom announced its fourth quarter and full year financial results, revealing operational issues and financial results far worse than those previously disclosed to investors. This was the third consecutive adverse report by the Company since going public.

11.     For the fourth quarter of 2020, Vroom suffered a net loss of $60.7 million, a 41.9% year-over-year increase. Also, Vroom suffered a $55.9 million Adjusted EBITDA loss during the

quarter, which was $3.9 million above the range provided by the Individual Defendants. The Company's press release further disclosed that Vroom had achieved only $1,821 total gross profit per ecommerce unit, which was $229 below the range provided by previous guidance. Moreover, Vroom generated only $878 gross profit per vehicle, which represented a 13% decline year-over-year.

12.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business and operations. Specifically, the Individual Defendants failed to disclose that: (i) the Company's lack of inventory had constrained its ability to increase revenues in the second quarter of 2020 and meet the surge in demand for online used vehicles; (ii) in response to a sustained and fundamental market shift to lower-priced vehicles, the Company slashed the average selling price per vehicle by over 15%; and (iii) Vroom's lack of adequate sales and support staff had resulted in degraded customer experiences, lost sales opportunities, and a greater than 10% increase in average days to sale for Vroom products.  Inadequate inventory combined with inadequate sales and support staff caused a domino effect: (1) the Company needed to invest millions into increasing inventory, adding sales and support staff, and bolstering the Company's logistic networks, which materially impaired Vroom's short-term profitability; (2) this caused materially lower profits per vehicle and poised the Company to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; (3) this further caused the Company's inventory growth to far outpace the capabilities of existing sales and support personnel, creating a logistical bottleneck that threatened the value of the Company's existing inventory and its ability to achieve positive cash flows; (4) as a result, the Company was unable to sell a significant portion of existing inventory because of inadequate sales personnel; (5) which forced Vroom to sell existing inventory at fire sale prices.

4

As a result of all of the foregoing, the Company was on track to miss its fourth quarter 2020 profit and earnings guidance, and thus, the Company's public statements were materially false and misleading.

13.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

14.     As detailed herein, and as alleged in the ongoing federal securities class action in the Southern District of New York styled *In re: Vroom, Inc. Securities Litigation*, Case No. 1:21-cv-02477-PGG, (the "Federal Securities Class Action"), Vroom's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

17.     Venue is proper in this District because the Company's principal place of business is in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District and the Federal Securities Class Action is ongoing in this District.

## THE PARTIES

### Plaintiff

18.     Plaintiff Julie Rainey is and has continuously been a stockholder of Vroom during the wrongdoing complained of herein.

### Nominal Defendant

19.     Defendant Vroom is a Delaware corporation with its principal executive offices at 1375 Broadway, Floor 11, New York, New York 10018. Vroom's shares trade on the NASDAQ under the ticker symbol "VRM."

### Individual Defendants

20.     Paul J. Hennessy ("Hennessy") has served as the Company's CEO and as a director since June 2016. For the fiscal year ended December 31, 2020, he received $4,315,077 in total compensation from the Company.

21.     David K. Jones ("Jones") has served as the Company's CFO since November 2018. For the fiscal year ended December 31, 2020, he received $869,313 in total compensation from the Company. During the Relevant Period, Jones made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| December 7, 2020 | 10,000 | $34.92 | $349,200 |
| December 18, 2020 | 15,000 | $40 | $600,000 |
| January 7, 2021 | 23,039 | $41.49 | $955,888 |
| January 7, 2021 | 1,961 | $42.16 | $82,675 |
| February 8, 2021 | 3,957 | $47.62 | $188,432 |
| February 8, 2021 | 14,535 | $48.77 | $708,871 |
| February 8, 2021 | 6,508 | $49.49 | $322,080 |
| February 9, 2021 | 15,105 | $50 | $755,250 |
| February 10, 2021 | 9,895 | $50.02 | $494,947 |
| | | **Total Proceeds:** | $4,457,343 |

22.     Patricia Moran ("Moran") has served as the Company's Chief Legal Officer

("CLO") and Secretary since January 2019. For the fiscal year ended December 31, 2020, she received $668,240 in total compensation from the Company. During the Relevant Period, Moran made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| February 9, 2021 | 29,400 | $50 | $1,470,000 |
| February 10, 2021 | 45,600 | $50.08 | $2,283,648 |
| | | Total Proceeds: | $3,753,648 |

23.    Mark E. Roszkowski ("Roszkowski") has served as the Company's Chief Revenue Officer ("CRO") since February 2019. For the fiscal year ended December 31, 2020, he received $874,588 in total compensation from the Company. During the Relevant Period, Roszkowski made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| February 5, 2021 | 21,875 | $45 | $984,375 |
| February 16, 2021 | 12,054 | $50.95 | $614,151 |
| February 16, 2021 | 8,720 | $51.83 | $451,957 |
| February 16, 2021 | 1,101 | $52.46 | $57,758 |
| | | Total Proceeds: | $2,108,241 |

24.    Robert J. Mylod, Jr. ("Mylod") has served as a Company director since September 2015. He is the Chair of the Audit Committee. For the fiscal year ended December 31, 2020, Mylod received $29,424 in total compensation from the Company.

25.    Scott A. Dahnke ("Dahnke") has served as a Company director since July 2015. For the fiscal year ended December 31, 2020, he received $19,055 in total compensation from the Company.

26.    Michael J. Farello ("Farello") has served as a Company director since July 2015.

For the fiscal year ended December 31, 2020, he received $19,615 in total compensation from the Company.

27.     Laura W. Lang ("Lang") has served as a Company director since May 18, 2020. She serves as a member of the Audit Committee. For the fiscal year ended December 31, 2020, Lang received $271,016 in total compensation from the Company.

28.     Laura G. O'Shaughnessy ("O'Shaughnessy") has served as a Company director since May 18, 2020. For the fiscal year ended December 31, 2020, she received $257,934 in total compensation from the Company.

29.     Together, individual defendants Mylod and Lang are referred to herein as the "Audit Committee Defendants."

30.     Collectively, Individual Defendants Hennessy, Jones, Moran, Roszkowski, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy, are referred to herein as the "Individual Defendants."

31.     The Individual Defendants, because of their positions with Vroom, possessed the power and authority to control the contents of Vroom's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### The Individual Defendants' False and Misleading Statements

*June 9, 2020 IPO Registration Statement*

32.     On June 9, 2020, the Company filed a prospectus on Form 424B4 in connection with its IPO (the "Prospectus"). The Prospectus incorporated and formed part of the registration statement on Form S-1, which the Company originally filed on May 18, 2020 (the "Registration Statement") and later amended on June 1 and June 5, 2020. The Registration Statement was signed by Defendants Hennessy, Jones, Mylod, Dahnke, and Farello. The June 1 and June 5, 2020 amendments to the Registration Statement were signed by Defendants Hennessy, Jones, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy. The Prospectus and Registration Statement (together with the amendments to the Registration Statement) are collectively referred to as the "IPO Registration Statement."

33.     The IPO Registration Statement stated that the Company's vehicle operations were "scalable and vertically integrated" and that the Company used "[d]ata [s]cience and [e]xperimentation" to "continually drive optimization and operating leverage across [Vroom's] ecommerce and vehicle operations…analyze market dynamics at scale…and optimize [Vroom's] overall inventory sales velocity." In a section titled "What We Do[,]" the IPO Registration Statement touted the Company's "[e]normous inventory selection" and "[e]xceptional customer support[.]"

34.     Regarding the impact of COVID-19 on Vroom, the IPO Registration Statement stated, in relevant part:

> [W]e significantly reduced our total inventory levels as well as our inventory floorplan utilization. Due to the inventory price reductions that began in late March, our demand returned to pre-COVID-19 levels, and we experienced robust ecommerce vehicle sales; however, those sales were at a greatly reduced gross profit per unit. On April 20, 2020, we began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that we believe will convert at target margins. We intend to strategically build our inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels.

35.     Regarding inventory management, planning, procurement, and pricing, the IPO Registration Statement stated, in relevant part:

### *Inventory Management*

Our inventory assortment and pricing models ingest millions of data points each day as **we monitor, calibrate, and adjust our inventory position to fluctuations in the national market and within our ecommerce platform, including predicted sales performance and real-time customer demand and conversion.**

### *Inventory Planning*

Using national demand and conversion data, including both Vroom historical performance and third-party sales, we establish target inventory levels by vehicle type, price point, mileage, features, and other key attributes. **We seek to maintain an optimal inventory mix to produce desired profits, sales velocity, and conversion outcomes as we manage our overall gross profit and growth rates.**

### *Inventory Procurement*

We source inventory from auctions, consumers, rental car companies and dealers. As we acquire vehicles, we continuously monitor inventory levels against our overall inventory model. In sourcing vehicles, **we ingest supply available for sale nationally in the wholesale market and target vehicles for purchase based on our retail criteria, target margins, expected sales velocity and consumer demand that we see on our ecommerce platform and across our network of marketing partners.**

### *Inventory Pricing*

Using recent national sales data and leveraging proprietary data analytics, we establish the likely fair market value of each distinct VIN in our inventory, making adjustments based on the unique characteristics of the vehicle. Once the vehicle is posted for sale, we monitor real-time demand, conversion, sales velocity, and profitability data across our listed inventory. **Using our data analytics, we constantly evaluate a variety of variables that impact conversion and adjust pricing, if needed, within our profitability targets.**

(Emphasis in italics original; emphasis in bold).

36.     In a section of the IPO Registration Statement titled "Our Growth Strategies and Path to Profitability[,]" the Company touted its purportedly strong growth trajectory, which it attributed to, among other things, proper inventory management. The IPO Registration Statement

stated, in relevant part:

> **Our business has grown significantly as we have scaled our operations.** Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. **The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion.** This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage.

(Emphasis added).

37.     The IPO Registration Statement further explained that the Company's growth coalesced around multiple strategies that served as points on a "Growth Flywheel[,]" which was comprised of four components: (i) conversion; (ii) vehicle inventory; (iii) customer experience; and (iv) marketing. According to the Company, these four components of the flywheel were influenced by ecommerce, vehicle operations, data science, and experimentation. The IPO Registration Statement detailed the strategies comprising the "Growth Flywheel" as follows:

- **Grow and Optimize Vehicle Inventory.**   We use data analytics to inform our pricing and inventory selection, which enables us to curate an optimal inventory that matches demand signals, driving higher conversion and sales. As we grow, we will continuously refine our inventory mix and expand our offerings across vehicle price points to serve a greater range of customers and increase our demand and conversion opportunities.

- **Expand Marketing and Maximize ROI.**   The strength of our brand and effectiveness of our advertising programs is critical to our ability to attract new customers cost effectively. Leveraging our advanced data analytics, we will continue to invest in national marketing campaigns and targeted performance marketing to identify, attract and convert new customers at lower cost. We also run sophisticated digital marketing across various vehicle listing sites, constantly monitoring performance and maximizing ROI with limited reliance on any one platform. Additionally, to date we have used search aggregators and social media platforms for advertising on a very limited basis, and we continuously seek new cost-efficient marketing opportunities and channels.

- **Deliver Exceptional Customer Experience.**   We believe that customer experience is fundamental to the growth of our business. We will continue to

invest in our platform to further streamline the transaction process for our customers. We will also continue to invest in the development of our mobile experiences, including iOS and Android mobile applications, to strengthen customer engagement. We believe these investments will lead to greater consumer traffic to our platform, higher levels of customer satisfaction and increased conversion and sales.

- **Increase Conversion.** Sales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel. We will continue to invest in our technology framework to optimize all aspects of our conversion funnel by constantly A/B testing our web and mobile applications to ensure we are displaying the features and formats that are most likely to resonate with our customers and lead to increased sales.

38.     The IPO Registration Statement also touted Vroom's tremendous revenue growth, particularly in the ecommerce segment, stating that "ecommerce revenue grew at a 77.0% compound annual growth rate ('CAGR') from 2016 to 2019, including year-over-year growth of 95.3% from 2018 to 2019." The IPO Registration Statement continued to tout the revenue generation for 2018 and 2019:

> **For the year ended December 31, 2019, we generated $1.2 billion in total revenue, representing a 39.3% increase over $855.4 million for the year ended December 31, 2018. For the three months ended March 31, 2020, we generated $375.8 million in total revenue, representing a 59.9% increase over $235.1 million for the three months ended March 31, 2019.** Our business generated a net loss of $85.2 million, $143.0 million, $27.1 million and $41.1 million for the years ended December 31, 2018 and 2019 and for the three months ended March 31, 2019 and 2020, respectively. **We intend to continue to invest in growth to scale our company responsibly and drive towards profitability.**

(Emphasis added).

39.     Additionally, the IPO Registration Statement displayed Vroom's rising ecommerce revenue from 2016 through 2019 with the following chart, which again highlighted the Company's significant growth in ecommerce revenue from 2018 to 2019.



*June 11, 2020 TheStreet Interview*

40.     On June 11, 2020, Defendant Hennessy appeared for an interview on the investor new site *TheStreet*.[1] During the interview, Hennessy claimed that a shift to individual ownership is a "positive tailwind in [Vroom's] business." He went on to state that the "growth that we've had and now the continued tailwind that we're seeing in our business, all I can say is that Vroom is in an excellent position to enter the public markets and serve our customers well." Regarding furloughs, Hennessy stated that they were "just about in our rearview window, and now we're back to work and scaling the business."

41.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business and operations. Specifically, the Individual Defendants failed to disclose that: (i) the Company's lack of inventory had constrained its ability to increase revenues in the second quarter of 2020 and meet the surge in demand for online used vehicles; (ii) in response to a sustained and fundamental market shift to lower-priced vehicles, the Company slashed the average selling price per vehicle by over 15%; and (iii) Vroom's lack of adequate sales and support staff had resulted in degraded customer

---

[1] *See TheStreet*, Vroom CEO on the Used Car Market During COVID-19 (June 11, 2020), https://www.thestreet.com/video/vroom-ceo-on-used-car-market.

experiences, lost sales opportunities, and a greater than 10% increase in average days to sale for Vroom products.  Inadequate inventory combined with inadequate sales and support staff caused a domino effect: (1) the Company needed to invest millions into increasing inventory, adding sales and support staff, and bolstering the Company's logistic networks, which materially impaired Vroom's short-term profitability; (2) this caused materially lower profits per vehicle and poised the Company to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; (3) this further caused the Company's inventory growth to far outpace the capabilities of existing sales and support personnel, creating a logistical bottleneck that threatened the value of the Company's existing inventory and its ability to achieve positive cash flows; (4) as a result, the Company was unable to sell a significant portion of existing inventory because of inadequate sales personnel; (5) which forced Vroom to sell existing inventory at fire sale prices. As a result of all of the foregoing, the Company was on track to miss its fourth quarter 2020 profit and earnings guidance, and thus, the Company's public statements were materially false and misleading.

**The Truth Begins to Emerge**

***August 12, 2020 Form 8-K, Earnings Call and August 13, 2020 10-Q***

42.     On August 12, 2020, Vroom filed a press release on Form 8-K (the "August 12, 2020 Form 8-K"), which announced the Company's financial results for the second quarter ended June 30, 2020. For the second quarter 2020, the press release highlighted $253.1 million in revenues, largely as a result of the average vehicle selling price per ecommerce unit declining 17.4%, and $314 in average gross profit per ecommerce vehicle, a 75% year-over-year decline. For the third quarter of 2020, the press release announced guidance of average total revenue per unit of just $23,500, a 25% average year-over-year decline, and average gross profit per unit of

only $1,600 to $1,700.

43.     Defendant Hennessy was quoted in the August 12, 2020 Form 8-K, stating:

I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment. During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. **We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce.**

(Emphasis added).

44.     That same day, during after-market hours, Vroom held an earnings call, attended by Defendants Jones and Hennessy, to discuss the second quarter 2020 financial results. During the call, Defendant Hennessy stated, in relevant part:

So yes, COVID has been a huge challenge for us. **But it's also given us the added confidence to go bigger, faster because of the unplanned but very valuable derisking exercise that we just executed.**

And that brings us to today. We definitely have a bit of a high-class problem right now. We were so successful selling down our inventory in April that we were somewhat caught offguard as demand snapped back. Thus, we spent every day since May trying to build back our inventory, all while our customers prevent us from doing so to the degree that we want and with the speed that we want because demand has been so robust. **From a sales perspective, we have been a classic example of a V-shape recovery.**

* * *

[W]e've got capacity, as [Jones] articulated, lined up not only in Q3 to match our guidance, but now – and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. **So we believe that we're almost out of this capacity constraint issue in this quarter.**

(Emphasis added).

45.     Also during the earnings call, Defendant Jones stated, that "We're confident that we can -- currently have the capacity to meet our Q3 targets, and we believe our utilization will continue to increase, and we work with our reconditioning partners to continue expanding our reconditioning network." In response to an analyst's question regarding vehicle reconditioning, Defendant Jones stated, "[Y]ou had mentioned bottleneck. I think we're not currently experiencing any significant capacity constraints in any of those."

46.     On August 13, 2020 the Individual Defendants caused the Company to file the second quarter 2020 financial results for the period ended June 30, 2020 (the "2Q 2020 10-Q") which reiterated the financial results from the August 12, 2020 Form 8-K. The 2Q 2020 10-Q was signed by Defendants Hennessy and Jones. Defendants Hennessy and Jones also certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the 2Q 2020 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the information contained in the 2Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

47.     The 2Q 2020 10-Q reiterated positive material misstatements from the IPO Registration Statement. The 2Q 2020 10-Q stated that the Company's vehicle operations were "scalable and vertically integrated" and that the Company used "[d]ata [s]cience and [e]xperimentation" to "continually drive optimization and operating leverage across [Vroom's] ecommerce and vehicle operations…analyze market dynamics at scale…and optimize [Vroom's] overall inventory sales velocity."

48.     On this news, the Company's stock price fell to $56.37 on August 13, 2020, a 18.3% decrease from the previous trading day's closing price of $69.01.

*September 8, 2020 Form 8-K*

49.     On September 8, 2020, the Company filed a Form 8-K, which provided an update regarding the Company's operational and financial results and stated, in relevant part:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, **we have experienced continued growth in ecommerce units sold.** As well, the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit. **As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic.** Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows:
>
> - Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), **average total revenue per unit of $24,500 (from $23,500)** and **average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).**

(Emphasis added).

50.     The September 8, 2020 Form 8-K was signed by Defendant Jones.

*September 8, 2020 Form S-1 and September 11, 2020 SPO Registration Statement*

51.     On September 8, 2020, the Company filed a registration statement on Form S-1 for a follow-on stock offering, pursuant to which the Company sold 10.8 million shares of Vroom stock at $54.50 per share for approximately $588.6 million in gross offering proceeds (the "Secondary Offering"). The Secondary Offering was signed by Defendants Hennessy, Jones, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy.

52.     On September 11, 2020, the Company filed a prospectus for the Secondary Offering on Form 424B4, which formed part of and incorporated the Secondary Offering (the "SPO Registration Statement"). The SPO Registration Statement stated that Vroom maintained "scalable and vertically integrated operations" and utilized data science to "drive optimization and operating

leverage across our ecommerce and vehicle operations" and to "enhance the customer experience…and optimize our overall inventory sales velocity." The SPO Registration Statement continued to tout Vroom's "[e]normous inventory selection" and "[e]xceptional customer support."

53.     The SPO Registration Statement also emphasized the Company's purported superior customer support and ability to scale quickly as competitive strengths, stating:

> *Customer Experience Team*.  In addition to our in-house customer support personnel, we have partnered with a leading customer experience management provider to operate our primary call center. This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies.

54.     The SPO Registration statement further highlighted the Company's asset-light, scalable operations, and inventory management, planning, procurement, and pricing:

> ### *Asset-Light, Scalable Operations*
>
> An asset-light strategy is fundamental to our business model, and our future growth strategies are focused on developing our ecommerce business without the need for substantial capital investment in physical retail locations. We seek to optimize the combination of ownership and operation of assets by us with strategic third-party partnerships. **Our strategy provides flexibility, agility and speed as we scale our business, without taking on the unnecessary risk and capital investment inherent in direct investment. We employ this hybrid approach across our business and utilize strategic relationships with experienced and trusted providers to optimize reconditioning services, logistics, consumer financing and customer experience.**
>
> ***
>
> ### *Inventory Management*
>
> Our inventory assortment and pricing models ingest millions of data points each day as **we monitor, calibrate, and adjust our inventory position to fluctuations in the national market and within our ecommerce platform, including predicted sales performance and real-time customer demand and conversion.**

*Inventory Planning*

Using national demand and conversion data, including both Vroom historical performance and third-party sales, we establish target inventory levels by vehicle type, price point, mileage, features, and other key attributes. **We seek to maintain an optimal inventory mix to produce desired profits, sales velocity, and conversion outcomes as we manage our overall gross profit and growth rates.**

*Inventory Procurement*

We source inventory from auctions, consumers, rental car companies, OEMs and dealers. As we acquire vehicles, we continuously monitor inventory levels against our overall inventory model. **In sourcing vehicles, we ingest supply available for sale nationally in the wholesale market and target vehicles for purchase based on our retail criteria, target margins, expected sales velocity and consumer demand based on our data analytics.**

*Inventory Pricing*

Using recent national sales data and leveraging proprietary data analytics, we establish the likely fair market value of each distinct VIN in our inventory, making adjustments based on the unique characteristics of the vehicle. **Once the vehicle is posted for sale, we monitor real-time demand, conversion, sales velocity, and profitability data across our listed inventory. Using our data analytics, we constantly evaluate a variety of variables that impact conversion and adjust pricing, if needed, within our profitability targets.**

(Emphasis in italics in original; Emphasis in bold).

55.     Regarding the Company's purported growth trajectory, the SPO Registration

Statement attributed the growth to, among other things, inventory management:

> **Our business has grown significantly as we have scaled our operations.** Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. **This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage.**

(Emphasis added).

56.     The SPO Registration Statement focused on the Company's ability to "**Deliver**

Exceptional Customer Experience" as one of the key growth strategies on Vroom's "Growth Flywheel[,]" stating that Vroom "seek[s] to provide customers with an intuitive, trustworthy and convenient buying and selling experience, and we will continue to invest in our platform to further streamline the transaction process for our customers." The SPO Registration Statement further stated that Vroom would "continue to invest in the development of our mobile experiences, including iOS and Android mobile applications, to strengthen customer engagement…these investments will lead to greater consumer traffic to our platform, higher levels of customer satisfaction and increased conversion and sales."

***November 11, 2020 Press Release and Earnings Call***

57.     On November 11, 2020, the Individual Defendants caused the Company to issue a press release (the "November 11, 2020 Press Release"), which was filed on Form 8-K the next day. The press release announced the Company's third quarter 2020 financial results for the period ended September 30, 2020 and gave guidance for the fourth quarter of 2020. Nevertheless, the Company claimed it was on track to achieve the following financial results for the fourth quarter:

- Ecommerce unit sales of 10,500 to 11,500, implying 25% sequential growth and Q4 year over year growth of 74% at the middle of the guidance range.

- Average ecommerce selling price per unit of $24,500 to $25,500 and **average ecommerce gross profit per unit of $2,050 to $2,150**.

- TDA unit sales of 1,400 to 1,600, average selling price per unit of $24,500 to $25,500 and average gross profit per unit of $1,650 to $1,750.

- Wholesale unit sales of 6,000 to 7,000, average selling price per unit of $9,500 to $10,500 and average gross profit per unit of breakeven to $100.

- Total revenue of $372 to $414 million.

- **Total gross profit of $24 to $28 million.**

- **EBITDA of ($52) to ($44) million.**

- Stock-based compensation expense of $4.3 million.

- **Net loss per share of ($0.41) to ($0.35).**

(Emphasis added).

58.     The press release quoted Defendant Hennessy highlighting the purported strength

of Vroom's business model:

> I am very pleased with our results for the third quarter, in which we successfully managed the challenges presented by the COVID-19 pandemic, outperformed our plan, demonstrated the strength of our business model, and hit the accelerator on significantly scaling our business. **By doing the things we said we would do -- adding vehicle inventory, increasing marketing, relying on data to drive decision making, and enhancing our customer experience -- we increased the velocity of the Vroom flywheel, drove conversion and increased GPPU. We will continue to execute our plan and invest in the growth of our business as we transform the market for buying and selling used vehicles.**

(Emphasis added).

59.     That same day, during after-market hours, the Company held an earnings call

attended by Defendants Jones and Hennessy. During the call, Hennessy revealed that the Company

was suffering from a "bottleneck" in sales support, or constrained growth, and needed to invest

heavily into building up the Company's sales support and logistics networks.

60.     Defendant Hennessy also spoke about Vroom's increased inventory and how the

Company successfully increased gross profits while taking advantage of increased customer

demand:

> **As we look at what drove our significant growth in units and gross profit, first and foremost, we see that our teams across the company executed against our playbook extremely well.** We leveraged our advanced data science to grow our listed inventory to over 12,000 units at the end of the quarter, a record high even compared to prepandemic levels, offering our customers outstanding selection and great prices. Vroom was able to generate a significant increase in e-commerce gross profit per unit to $2,188, up 39% year-over-year and 104% over the second quarter. We have seen demand during the pandemic shift towards lower-priced vehicles,

21

and we have responded to that demand. In doing so, we have demonstrated that we can deliver very strong unit economics over average selling prices in the mid-$20,000 range. This supports our long-range thesis that as we offer lower-priced vehicles, we'll be expanding our demand and conversion, while at the same time, expanding our unit economics.

***

The demand for Vroom model broadly and the demand for our products and services, specifically, remains very strong. There are a number of contributing factors. First, we continue to experience what we believe are structural changes in demand for our e-commerce and delivery model. **Second, increased inventory drives increased demand and increased conversion, which spins our growth flywheel, as demonstrated by our performance in unit sales growth and improving unit economics.** Finally, we've begun to see the early results of our new brand campaign. We launched new spots that showcase Vroom's better way to buy and better way to sell a used vehicle.

(Emphasis added).

61.     During the call, Defendant Hennessey continued to assert that Vroom was on track to meet its guidance and that the Company was positioned to take advantage of increased demand. During an exchange with analyst Ronald Victor Josey from JMP Securities LLC, Defendant Hennessey stated as follows:

**Ronald Victor Josey:**

Paul [Hennessy], I wanted to ask a little more about supply based on what we're just talking about. And I know -- I think you just said you don't believe Vroom is supply constrained. So maybe can you talk a little bit more about how Vroom is positioned for the all-important first half of the year as we go into 2021 for supply as demand still remains sort of elevated for used cars? And as you talk about that, any insights on just the overall demand from an October perspective? Did that continue from what you saw for September? Any insights on intra-quarter would be helpful as well.

**Hennessy:**

Sure. Supply, as I said, Ron, I think we're feeling in good shape. We're positioned ourselves to be selective because we've got great consumer demand to sell us their vehicles as well as auction market. Wholesale markets have come down, and we see great opportunity to buy cars there. So again, given our size, given our projected

22

sales and our growth rate, we feel like we're in a great position going forward.

> **As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that Dave talked about in terms of e-commerce growth on a year-over-year basis. It's just -- it's strong. So we're feeling really good.**

(Emphasis added).

62.     During the same call, Defendant Jones claimed that Vroom was efficiently converting demand through a focus on the Company's sales platform:

> Thanks, Paul. Good afternoon, everyone. Let me unpack the quarter a bit. E-commerce units sold in the third quarter increased 59% year-over-year, which was a new quarterly record for Vroom, driven by increased inventory and quality demand generation. As Paul mentioned, the e-commerce units were up 31% sequentially, again, due to an increased inventory offering. Listed vehicles increased to about 12,300 at the end of Q3, from 5,700 at the end of Q2 and are currently over 13,000. Of the 13-plus thousand vehicles listed today, excluding pending vehicle sales, approximately 72% are available for sale and the remainder are coming soon inventory. We are estimating 10,500 to 11,500 e-commerce units sold for Q4. The midrange of our guidance would imply 25% sequential growth quarter-to-quarter and accelerating 74% year-over-year growth compared to the 59% we experienced in Q3.

> Our formula is simple: Provide a data-driven selection of inventory, world-class marketing to create demand, and then we convert that demand. **We currently have ample reconditioning capacity, we can create plentiful demand, as Paul [Hennessy] mentioned, and we are currently expanding our sales platform to efficiently convert that demand.** That's our focus in Q4. Through the third quarter, our year-to-date e-commerce units sold has grown 86% year-over-year. **And with our strong sequential growth quarter-to-quarter, we are on track for continued strong growth in 2021.**

(Emphasis added).

63.     As the call continued, during an exchange with analyst Zachary Robert Fadem from Wells Fargo Securities, LLC, Defendant Jones claimed that the Company's inbound logistics capabilities offered a competitive tailwind that was supporting Vroom's profit growth and profit level of $3,000 per unit:

**Zachary Robert Fadem:**

Another one on the GPPU line. And as you think about all the long-term opportunities here from lower reconditioning costs, lower days to sell customer-sourced vehicles, et cetera, could you talk about what factors are contributing the most upside today? And as you think about 2021, how should we size these buckets or opportunities as we move into the New Year?

**David K. Jones:**

Yes, Zach, thanks for the question. **I think it's a little bit of everything, right?** If we think through the whole process, Paul [Hennessy] mentioned acquisitions, we've automated a majority of our acquiring effort now. We do hundreds of thousands of appraisals per week. And so that's really opened up the opportunities for us nationally for acquiring inventory. And as you know, those are skills that very few companies have. So we're very proud of that.

And so I think that gives us opportunities on sales margin. **As we then continue to expand our distributed reconditioning network, we've got opportunities on inbound logistics. I mentioned we've got 18 facilities today, which is -- puts us at a real advantage for ingesting inbound inventory from consumers and from auction and from different sources. So we think that's a tailwind.**

You mentioned reconditioning. We've been disclosing defects now for a while, and we continue to hone those skills and continue to work as hard as we can to set customer expectations both for the consumer experience, but it helps us refine our reconditioning efforts. And so we think there's a little bit across the board there. We've talked about -- a little bit about product already.

So I think it's a little bit of everything. I think when you think about Q4, obviously, we've got guidance out there for that. **But we're ultimately -- we've got a long-term goal to get to $3,000 of gross profit per unit. That's kind of our first stop -- our first station stop on the train. And we feel like we're making good progress towards that, and we'll continue that effort in 2021.**

(Emphasis added).

64.    On November 12, 2020, the Individual Defendants caused the Company to file Form 10-Q for the period ended September 30, 2020 (the "3Q 2020 10-Q"). The 3Q 2020 10-Q contained the financial information from the November 11, 2020 Press Release and was signed by Defendants Hennessy and Jones. Defendants Hennessy and Jones signed SOX certifications

representing, among other things, that the 3Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

65.     The 3Q 2020 10-Q restated materially false and misleading statements from the SPO Registration Statement. The 3Q 2020 10-Q reiterated that Vroom maintained "scalable and vertically integrated operations" and utilized data science to "drive optimization and operating leverage across our ecommerce and vehicle operations" and to "enhance the customer experience…and optimize our overall inventory sales velocity." The 3Q 2020 10-Q continued to tout that "[f]rom the launch of our combined operations in January 2016, our business has grown significantly as we have scaled our operations[.]"

66.     On this news, the Company's stock price decreased to $35.49 on November 12, 2020, a 13% decrease from the previous trading day's closing price of $40.80. Although some of the Company's deficiencies had been disclosed at this time, the stock continued to trade at artificially inflated prices because the Individual Defendants continued to make material misstatements regarding adverse events and uncertainties that were negatively impacting Vroom's business.

***Insiders Dump Stock Before the Truth Fully Emerges***

67.     On December 7, 2020, just one month after Defendant Jones touted the Company's business prospects, including a $3,000 gross profit per unit, he sold 10,000 shares while the price of the Company's stock was artificially inflated. Defendant Jones continued to sell stock while in possession of adverse material non-public information at artificially inflated prices: another 15,000 shares in mid-December 2020; 25,000 shares in January 2021; and 50,000 shares in early February 2021. His last sale of stock was at a price of $50.02 per share and less than one month from when the Company would disclose adverse material information to the public, causing the share price to

sink to $31.61. As the Company's CFO, Jones possessed insider information regarding the Company's inadequate inventory and sales and support staff when he made the trades listed above.

68.     Defendant Moran also sold stock while in possession of adverse material non-public information less than a month before the Company would disclose that information to the public. On February 9 and February 10, 2021, she sold 75,000 shares at approximately $50 per share for proceeds of $3,753,648, a staggering difference from what she would have earned if she had sold her shares after the truth fully emerged. As the Company's Chief Legal Officer, Moran possessed insider information regarding the Company's inadequate inventory and sales and support staff at the time she made these trades.

69.     Defendant Roszkowski also sold stock while in possession of adverse material non-public information less than a month before the Company would disclose that information to the public. On February 5 and February 16, 2021, he sold 43,750 shares at prices ranging from $45 to $52.46 per share, for proceeds of $2,108,241. As the Company's Chief Revenue Officer, Roszkowski possessed insider information regarding the Company's inadequate inventory and sales and support staff at the time he made these sales.

70.     Collectively, Defendants Jones, Moran, and Roszkowski reaped $10,319,232 in total proceeds from their insider sales. When the truth was fully revealed, as described below, the stock price would plummet to $31.61 per share. Collectively, Defendants Jones, Moran, and Roszkowski avoided losses of $3,404,551.

**The Truth Fully Emerges**

***March 3, 2021 Form 8-K and Earnings Call***

71.     On March 3, 2021, the Company filed a press release on Form 8-K (the "March 3, 2021 Form 8-K"), which announced the financial results for the fourth quarter and fiscal year

ended December 31, 2020. The March 3, 2021 Form 8-K announced the following disappointing results: a net loss of $60.7 million, an Adjusted EBITDA loss of $55.9 million, a net loss per share of $0.46, just $1,821 in total gross profit per ecommerce unit, and only $878 in gross profit per vehicle for the fourth quarter. The Adjusted EBITDA loss was $3.9 million more than the range the November 11, 2020 Press Release gave.

72.     That same day, during after-market hours, the Company held an earnings call attended by Defendants Jones and Hennessy. During the call, Defendant Hennessy revealed that Vroom was suffering from severe sales backlogs because of inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. He stated, in relevant part:

> Sales and sales support operations are in a significantly better place than they were at the end of Q3 2020. We've nearly tripled the amount of staffing in both our sales organizations and our sales support organizations, and they continue to be an area of investment in the first quarter. It is important to note that as we experienced exceptional growth in the second half of 2020, **backlogs in our business formed as there was more volume to process than our capacity could deliver. The result meant that our customers had to wait. When customers have to wait for us to complete a transaction or deliver a car, pick up a car, complete financial arrangements or register their vehicle, their experience is degraded.**
>
> As I mentioned, we've been invested in and will continue to invest in our sales and sales support organizations so that we remove any bottlenecks in our business as the business is scaling. **We believe we are tracking against this objective and are confident in our ability to eliminate the backlogs and deliver an exceptional customer experience.** I also want to make the point that our backlogs also contributed to a negative outcome on our retail and wholesale unit economics.
>
> ***
>
> Said another way, **we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4 and will continue to be moved in Q1.** We are confident that as our throughput increases as a result of our investments and as we turn our inventory faster, both our unit economics and our customer experience improve.

(Emphasis added).

73.    On this news, the Company's stock sank to $31.61 per share on March 4, 2021, a 28% decrease from the previous trading day's closing price of $43.90. From when the truth began to emerge on August 12, 2020 until it was fully revealed on March 3, 2021, the Company's stock price sank from August 12, 2020's closing price of $69.01 to March 4, 2021's closing price of $31.61, a 54% decrease.

## FIDUCIARY DUTIES

74.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Vroom and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Vroom in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Vroom and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

75.    Each Individual Defendant owed and continues to owe Vroom, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

76.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vroom, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Vroom, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, finances, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would

be based on truthful and accurate information.

77.     To discharge their duties, the Individual Defendants were/are required to exercise

reasonable and prudent supervision over the management, policies, practices, and controls of the

financial affairs of the Company. The Individual Defendants were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

> (b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

> (c)     remain informed as to how Vroom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

> (d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct**

78.     The Individual Defendants, as officers and/or directors of Vroom, were bound by

the Company's Code of Business Conduct and Ethics[2] (the "Code of Conduct"), which required,

in relevant part, the following:

> The continued success of Vroom is dependent upon our customers' trust and we are dedicated to preserving that trust. Employees owe a duty to Vroom, its customers and shareholders to act in a way that will merit the continued trust and confidence of the public.
>
> **Vroom will comply with all applicable laws and regulations and expects its directors, officers and employees to conduct business in accordance with the letter, spirit and intent of all relevant laws and regulations and to refrain from**

---

[2] *See* Vroom's Code of Business Conduct: 68cc7c1e-1104-4825-bb96-cad1d58a6665 (vroom.com).

**any illegal, dishonest or unethical conduct.**

\*\*\*

## Company Books and Records

Transparency is a critical element of trust. That need for transparency is absolute in all company documents – with employees, customers, and our financial books and records. It is our policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company.

**All employees must complete all Company documents accurately, truthfully, and in a timely manner**, including all travel and expense reports. When applicable, documents must be properly authorized. You must record the Company's financial activities in compliance with all applicable laws and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. You must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents.

\*\*\*

## Insider Trading

Preventing insider trading is necessary to comply with securities laws and to preserve the reputation and integrity of the Company. **"Insider trading" occurs when any person purchases or sells a security while in possession of material non-public information relating to Vroom. Insider trading is a crime and could lead to penalties for the Company and for you personally.** All employees must follow the Company's Insider Trading Compliance Policy and ensure that their family and other household members comply as well. If you have any questions about the Insider Trading Compliance Policy and what is allowed, please contact the Legal Department at legal@vroom.com.

\*\*\*

**Ultimate responsibility to ensure that we as a Company comply with the many laws, regulations and ethical standards affecting our business rests with each of us. You must become familiar with and conduct yourself strictly in compliance with those laws, regulations and standards and the Company's policies and guidelines pertaining to them.**

(Emphasis in bold and underline in original; emphasis in bold).

79.     Defendants Jones, Moran, and Roszkowski violated the Code of Conduct when they made insider sales of stock based on adverse material non-public information. The Individual Defendants also failed to adhere to the Code of Conduct when they failed to "truthfully" and "accurately" prepare reports.

80.     In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Vroom under the Audit Committee Charter (the "Audit Charter").[3] Specifically, the Audit Charter set forth the following responsibilities of the Audit Committee Defendants:

> The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Vroom, Inc. (the "Company") in its oversight of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.
>
> ***
>
> **Duties and Responsibilities**
>
> _Interaction with the Independent Auditor_
>
> _Appointment and Oversight._ The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit services, including but not limited to internal control-related services, and any non-audit services provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.
>
> ***

---

[3] _See_ Vroom's Audit Charter at: https://ir.vroom.com/static-files/f3f717fd-492f-457a-a603-018df1e72020.

*Financial Statements and Disclosures*

*Audit and Financial Reporting Problems*. The Committee must discuss separately with the independent auditor and management any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.

\*\*\*

Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Quarterly Report on Form 10-Q.

*Other Duties and Responsibilities*

*Review of Earnings Releases*. The Committee must review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

\*\*\*

*Review of Code of Business Conduct and Ethics*. The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

81.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business and operations. Specifically, the Individual Defendants failed to disclose that: (i) the Company's lack of inventory had constrained its ability to increase revenues in the second quarter of 2020 and meet the surge in demand for online used vehicles; (ii) in response to a sustained and fundamental market shift to lower-priced vehicles, the Company slashed the average selling price per vehicle by over 15%; and (iii) Vroom's lack of adequate sales and support staff had resulted in degraded customer

experiences, lost sales opportunities, and a greater than 10% increase in average days to sale for Vroom products. Inadequate inventory combined with inadequate sales and support staff caused a domino effect: (1) the Company needed to invest millions into increasing inventory, adding sales and support staff, and bolstering the Company's logistic networks, which materially impaired Vroom's short-term profitability; (2) this caused materially lower profits per vehicle and poised the Company to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; (3) this further caused the Company's inventory growth to far outpace the capabilities of existing sales and support personnel, creating a logistical bottleneck that threatened the value of the Company's existing inventory and its ability to achieve positive cash flows; (4) as a result, the Company was unable to sell a significant portion of existing inventory because of inadequate sales personnel; (5) which forced Vroom to sell existing inventory at fire sale prices. As a result of all of the foregoing, the Company was on track to miss its fourth quarter 2020 profit and earnings guidance, and thus, the Company's public statements were materially false and misleading.

## BREACHES OF DUTIES

82.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Vroom, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

83.    The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding inventory, the average selling price per vehicle, sales and support staff, and guidance for the fourth quarter of 2020 as described herein. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper

statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Vroom substantial damage.

84.     The Audit Committee Defendants also had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Vroom's public statements and internal control function.

85.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Vroom, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Vroom has expended, and will continue to expend, significant sums of money.

## DAMAGES TO VROOM

86.     The materially false and misleading statements have exposed the Company to myriad reputational and financial damages, including but not limited to:

      (a)    Possible restatements and goodwill impairments;

      (b)    Liability arising from the Federal Securities Class Action;

      (c)    Increased director and officer insurance premiums;

      (d)    The loss of credibility with customers and suppliers; and

      (e)    Legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.     Plaintiff brings this action derivatively and for the benefit of Vroom to redress

injuries suffered, and to be suffered, because of the Individual Defendants' insider trading, breaches of their fiduciary duties as directors and/or officers of Vroom, waste of corporate assets, unjust enrichment, and violation of Section 20(a) of the Exchange Act.

88.    Vroom is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.    Plaintiff is, and has been continuously, a stockholder of Vroom. Plaintiff will adequately and fairly represent the interests of Vroom in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

90.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

91.    A pre-suit demand on the Board of Vroom is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy (the "Director Defendants"), along with Paula B. Pretlow and Frederick O'Terrell, who are not defendants in these proceedings. Plaintiff needs only to allege demand futility as to half of the eight directors who are on the Board at the time this action is commenced.

92.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

93.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

94.     Demand on Defendant Hennessy is futile because he has served as CEO and as a Company director since June 2016. He has received and continues to receive compensation for his role as CEO as described herein. Hennessy signed and thus personally made the materially false and misleading statements in the Registration Statement, including its amendments, the 2Q 2020 10-Q, the 3Q 2020 10-Q, and the Secondary Offering. He is a named defendant in the Federal Securities Class Action and personally made materially false and misleading statements in the June 11, 2020 *TheStreet* interview, the August 12, 2020 Form 8-K, the August 12, 2020 Earnings Call, the November 11, 2020 Press Release, and the November 11, 2020 Earnings Call. Further, the Company filed Form DEF 14A on April 29, 2021 (the "Proxy"), which acknowledges that Hennessy is not an independent director. For these reasons, Hennessy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

95.     Demand on Defendant Mylod is futile because he has served as a Company director since September 2015. He has received and continues to receive compensation for his role as a director as described herein. Mylod signed and thus personally made the materially false and misleading statements in the Registration Statement, including its amendments, and the Secondary Offering. Further, Mylod has served as Chair of the Audit Committee since the start of the Relevant

Period. For these reasons, Mylod breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

96.     Demand on Defendant Dahnke is futile because he has served as a Company director since July 2015. He has received and continues to receive compensation for his role as a director as described herein. Dahnke signed and thus personally made the materially false and misleading statements in the Registration Statement, including its amendments, and the Secondary Offering. Additionally, the Proxy states that Dahnke is the co-CEO of L Catterton and that L Catterton designated Dahnke and Farello as directors of the Company upon the closing of the Company's IPO. Farello is currently a managing partner at L Catterton and Lang is on L Catterton's Senior Advisor Team. According to the Proxy, L Catterton's affiliated entities beneficially own 14.5% of the Company's common stock as of March 31, 2021. The 14.5% consists of (i) 6,994,354 shares of common stock held of record by CGP2 Zoom Holding, L.P. ("CGP2 Zoom"), (ii) 10,589,776 shares of common stock held of record by CGP2 Lone Star, L.P. ("CGP2 Lone Star") and (iii) 2,156,885 shares of common stock held of record by LCGP3 Accelerator, L.P. ("LCGP3 Accelerator"). CGP2 Managers, L.L.C. is the general partner for each of CGP2 Zoom and CGP2 Lone Star. CGP3 Managers, L.L.C. is the general partner of LCGP3 Accelerator. The management of each of CGP2 Managers, L.L.C. and CGP3 Managers, L.L.C. is controlled by a managing board. Dahnke is a member of the managing board of each of CGP2 Managers, L.L.C. and CGP3 Managers, L.L.C. According to a press release on L Catterton's website, it acquired Steiner Leisure Limited for $925 million in December 2015.[4] Defendant Lang's LinkedIn page notes that she has served as a "Board Director" at Steiner Leisure Limited

---

[4] *See* L Catterton, Catterton Completes Acquisition of Steiner Leisure Limited (Dec. 9, 2015), https://www.lcatterton.com/Press.html#!/Catterton_Completes_Steiner_Leisure_Transaction.

since February 2016. For these reasons, Dahnke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

97.    Demand on Defendant Farello is futile because he has served as a Company director since July 2015. He has received and continues to receive compensation for his role as a director as described herein. Farello signed and thus personally made the materially false and misleading statements in the Registration Statement, including its amendments, and the Secondary Offering. As mentioned above, Farello is a managing partner at L Catterton and thus is beholden to L Catterton's co-CEO Dahnke. For these reasons, Farello breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98.    Demand on Defendant Lang is futile because Lang has served as a Company director since May 2020. She has received and continues to receive compensation for her role as a director as described herein and has been a member of the Audit Committee since the start of the Relevant Period. Lang signed and thus personally made the materially false and misleading statements in the amendments to the Registration Statement and the Secondary Offering. As previously mentioned, Lang serves as a board director at Steiner Leisure Limited, which was acquired in 2015 by L Catterton. Furthermore, she serves as a senior advisor at L Catterton; thus, she is beholden to Defendants Dahnke and Farello. For these reasons, Lang breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

99.    Demand on Defendant O'Shaughnessy is futile because she has served as a Company director since May 2020. She has received and continues to receive compensation for

her role as a director as described herein. O'Shaughnessy signed and thus personally made the materially false and misleading statements in the amendments to the Registration Statement and the Secondary Offering. For these reasons, she breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

100.     As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

101.     The Director Defendants have longstanding business relationships with each other and the Individual Defendants, which means they cannot act independently and in the best interests of the Company. Director Defendants Dahnke, Farello, and Lang each are employed at L Catterton together. Director Defendants Mylod, Dahnke, Farello, and Hennessy have served on the Board together since 2016. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile.

102.     Moreover, pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and

internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

103.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

104.   Vroom has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Vroom any part of the damages Vroom suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

105.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the directors face a substantial likelihood of liability, they are self-interested in the misconduct described herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

106.    The acts complained of herein constitute violations of fiduciary duties owed by Vroom's officers and directors, and these acts are incapable of ratification.

### Insurance Considerations

107.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Vroom. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Vroom, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

108.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Vroom to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

109.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least half of the Board, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants Jones, Moran, and Roszkowski
*for Insider Trading*

110.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

111.    When Jones, Moran, and Roszkowski sold over $10.3 million worth of their personal Vroom shares, they were in possession of material, non-public information regarding the Company's lack of inventory and inadequate sales and support staff, both of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Vroom's inventory, sales, and support staff would destroy millions in market capitalization when revealed to the market.

112.    The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by Vroom insiders. The information which formed the basis of the sales of stock made by Defendants Jones, Moran, and Roszkowski was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to Vroom, which was usurped for the benefit of Defendants Jones, Moran, and Roszkowski and to the detriment of the Company.

113.    The use of this information by Defendants Jones, Moran, and Roszkowski was a breach of their fiduciary duty of loyalty. Their insider sales of stock in December 2020, January 2021, and February 2021 were predicated upon their possession of material, adverse, non-public information to which they had access as Vroom insiders.

114.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

115.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.     The Individual Defendants, by virtue of their positions with Vroom and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Vroom and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Vroom to engage in the illegal conduct and practices complained of herein.

117.     Plaintiff, on behalf of Vroom, has no adequate remedy at law.

## THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

118.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vroom's business and affairs.

120.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

121.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Vroom.

122.     In breach of their fiduciary duties, the Individual Defendants caused the Company

to engage in the misconduct described herein.

123.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

124.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that Vroom was on track to meet the growing consumer demand in the online used car market, yet failed to disclose that: (i) the Company's lack of inventory had constrained its ability to increase revenues in the second quarter of 2020 and meet the surge in demand for online used vehicles; (ii) in response to a sustained and fundamental market shift to lower-priced vehicles, the Company slashed the average selling price per vehicle by over 15%; and (iii) Vroom's lack of adequate sales and support staff had resulted in degraded customer experiences, lost sales opportunities, and a greater than 10% increase in average days to sale for Vroom products.  Inadequate inventory combined with inadequate sales and support staff caused a domino effect: (1) the Company needed to invest millions into increasing inventory, adding sales and support staff, and bolstering the Company's logistic networks, which materially impaired Vroom's short-term profitability; (2) this caused materially lower profits per vehicle and poised the Company to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; (3) this further caused the Company's inventory growth to far outpace the capabilities of existing sales and support personnel, creating a logistical bottleneck that threatened the value of the Company's existing inventory and its ability to achieve positive cash flows; (4) as a result, the Company was unable to sell a significant portion of existing inventory because of inadequate sales personnel; (5) which forced Vroom to sell existing inventory at fire sale prices. As a result of all of the foregoing, the Company was on track to miss its fourth

quarter 2020 profit and earnings guidance, and thus, the Company's public statements were materially false and misleading.

125.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

126.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

127.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that The Company's internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

128.    These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

129.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vroom has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Vroom.

133.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Vroom tied to the performance or artificially inflated valuation of Vroom, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

134.    Plaintiff, as a stockholder and a representative of Vroom, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

135.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants**
*for Waste of Corporate Assets*

136.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend the Individual Defendants' unlawful actions and to engage in internal investigations, and Vroom will lose financing from investors and business from future customers who no longer trust the Company and its products.

138.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

139.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

## PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Vroom, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to Vroom;

C.    Awarding to Vroom the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Vroom and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Vroom and its stockholders from a repeat of the

damaging events described herein;

E.      Awarding Vroom restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: August 17, 2021                          Respectfully submitted,

                                                */s/ Gregory M. Nespole*
                                                **LEVI & KORSINSKY, LLP**
                                                Gregory M. Nespole
                                                Daniel Tepper
                                                Correy Kamin
                                                Ryan C. Messina*
                                                55 Broadway, 10th Floor
                                                New York, NY 10006
                                                T. 212.363.7500
                                                F. 212.363.7171
                                                gnespole@zlk.com
                                                dtepper@zlk.com
                                                ckamin@zlk.com
                                                rmessina@zlk.com
                                                *Application for admission forthcoming

                                                *Attorneys for Plaintiff Julie Rainey*

**VERIFICATION**

      I, Julie Rainey, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to thosematters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

*Julie Rainey*

Julie Rainey (Aug 17, 2021 12:18 CDT)

Print Name: Julie Rainey           Date: 08/17/2021